NOT DESIGNATED FOR PUBLICATION

No. 126,306

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FREDDY DAVID MORAN-ESPINOSA,
*Appellant.*

MEMORANDUM OPINION

Appeal from Greenwood District Court; JANETTE L. SATTERFIELD, judge. Oral argument held January 7, 2025. Opinion filed February 21, 2025. Affirmed in part and reversed in part.

*Kevin J. Zolotor*, of O'Hara & O'Hara LLC, of Wichita, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and COBLE, JJ.

PER CURIAM: The State charged Freddy David Moran-Espinosa with several crimes—criminal use of a weapon, vital record identity fraud, unlawful possession of a controlled substance, and two counts of possession of drug paraphernalia—following a search of his car which had run out of gas on the side of a highway. Moran-Espinosa unsuccessfully moved to suppress evidence seized from a search of the car, and the district court later convicted Moran-Espinosa of each offense. He appeals, challenging the district court's denial of his motion to suppress and the sufficiency of the evidence supporting his identity fraud conviction. As explained below, we affirm the district

court's ruling on Moran-Espinosa's motion to suppress but reverse his conviction for identity fraud.

*Factual and Procedural Background*

At around noon on October 31, 2021, an on-duty officer, Rodney Craig, saw a car pulled over on a two-lane highway in Greenwood County. His attention was drawn to the car because it was partly in the highway and its driver's door was open. With its open door, the car extended almost halfway into the lane of traffic.

Craig turned on his emergency lights because the car posed "a safety issue" and he wanted to indicate to oncoming traffic that something was in the roadway. The car posed a "traffic hazard" on the road because the road was a two-lane highway, it had no shoulders, and there was a lot of traffic. And just a little north was a hill, and the car could have caused an accident for somebody coming from that direction.

Craig then pulled up behind the car. As he approached, he saw two men standing outside the car—one with a gas can in hand. A third person, Marina Mondragon, was sitting inside the car. The man with the gas can, later identified as Ceanta Plummer, approached and volunteered that the car had run out of gas and they had no money. Craig carried no gas in his vehicle. He asked Plummer for identification. Plummer responded that he did not have an identifying document but gave Craig his name and birthdate. Craig turned to Moran-Espinosa, requested his driver's license, asked who was driving, and asked who the vehicle belonged to. Moran-Espinosa handed Craig his driver's license and other documents and stated that he drove and owned the car.

Craig looked at Moran-Espinosa's license and saw that it had been issued in Mexico but listed a home address in Mississippi, which immediately made him suspect

2

that the license was fake. He returned to his patrol car and ran both men's information. Craig confirmed Plummer's identity and found his license was suspended. But his search for Moran-Espinosa showed "no record" of his Mexico license or of any license issued to him in the United States. After he called Moran-Espinosa's information in, he realized the license had also expired in 2016.

Deputies Michael Lazar and James Cude arrived separately, unrequested, to provide backup. Cude spoke with Mondragon, then returned to Craig's patrol car and told Craig to request a K-9 unit to sniff the car. Craig did so, Cude left, and Lazar arrived. After he called for the canine, Craig ran passenger Mondragon's license and found that hers was also suspended.

Officer Michael Miles and his canine partner responded to Craig's call and performed a dog sniff. The dog alerted on the vehicle near the rear-passenger area on the driver's side and indicated that the car contained some substance. Officers then searched the car. Craig found a black canvas bag in the back of the car containing over 100 small, plastic Ziploc bags that Craig recognized as the kind commonly used for distributing illegal narcotics. Lazar found two handguns—one reportedly stolen—three electronic scales, and a glass pipe. Miles found a second pipe, which contained drug residue.

Craig then arrested and searched Moran-Espinosa. In his wallet, Craig found bank and casino cards with other people's names on them and a social security card bearing Moran-Espinosa's name. Craig then confirmed Moran-Espinosa's identity by contacting immigration and custom services. Craig also requested information from dispatch regarding the number listed on the social security card and learned that the number did not belong to Moran-Espinosa but to a 17-year-old in Missouri. When Craig later asked Moran-Espinosa about these cards and other documents found during the search, Moran-Espinosa replied that he had found the bank and casino cards on the casino floor or at the

restaurant where he worked. He admitted that someone had made the social security card for him for work.

*Pretrial Proceedings*

In an amended complaint, the State charged Moran-Espinosa with criminal use of a weapon, vital records identity fraud (based on the social security card), unlawful possession of a controlled substance, two counts of unlawful possession of drug paraphernalia, and two counts of theft.

Moran-Espinosa moved to suppress the evidence obtained from the searches of his car and person, claiming that he had been illegally detained and searched. His motion argued that Craig had not made a valid public safety stop, that Craig lacked reasonable suspicion of criminal activity to request his driver's license, and alternatively, that Craig had impermissibly extended the scope of the stop by investigating potential crimes. The State countered that Craig had conducted a valid public safety stop which legally expanded to an investigatory stop after Craig formed a reasonable suspicion that Moran-Espinosa was committing a crime.

The district court held an evidentiary hearing on the motion. The State called Craig as its only witness. Craig immediately learned that the car was out of gas upon approaching the car. He then asked for everyone's information but did not demand it. Moran-Espinosa "willingly . . . pulled a handful of cards out of his pocket, and handed [him] . . . a Mexico driver's license, that had an address of Cleveland, Mississippi on it." Craig had never seen this before and immediately believed that it could be fake.

Craig stated that he was not investigating a crime during the first portion of the stop and simply asked for identification to find out "who [he] was talking to." He also stated that after seeing Moran-Espinosa's license, he turned his efforts toward

4

investigating the license. He admitted that the specific reason he ran the information was to check for "wants or warrants on these people." Craig did not know what other officers generally did, but he typically asked for identifications and ran each person's information during traffic stops, as he had learned from other officers during his training. This was his standard practice even when he did not have reasonable suspicion of a crime.

After running the three occupants' information, Craig found that none of them could lawfully drive the car. Moran-Espinosa probably had no license, and the other passengers' licenses were suspended. He found no record of Moran-Espinosa having a license in any state but never conclusively determined whether Moran-Espinosa's Mexico license was fake until after the searches and Moran-Espinosa's arrest. He did not run Mondragon's information until after he called for the canine.

The district court took the matter under advisement and then denied Moran-Espinosa's suppression motion. The district court considered *State v. Ellis*, 311 Kan. 925, 469 P.3d 65 (2020), and found that Craig's initial stop was a valid public welfare check, and that Moran-Espinosa had not been improperly detained. Craig acted legally in requesting identification and Moran-Espinosa had given Craig a driver's license that created a reasonable suspicion that Moran-Espinosa was committing a crime. Craig thus acted appropriately in expanding the welfare check to an investigative detention. Moran-Espinosa timely appeals.

*Did the District Court Err by Denying Moran-Espinosa's Motion to Suppress Evidence?*

Moran-Espinosa argues that the district court's factual findings are unsupported by substantial competent evidence and contrary to the evidence at the suppression hearing. His arguments focus primarily on the facts that Craig activated his emergency lights, almost immediately requested identifications, and admitted to using an unlawful standard practice of requesting and running identifications during all traffic stops. He asks us to

5

find: (1) the initial stop was not a valid public safety stop; (2) the stop did not appropriately transform to an investigative detention because Craig did not have reasonable suspicion of criminal activity; and (3) Craig engaged in flagrant misconduct, which should be deterred.

*Preservation*

The State asserts that part of Moran-Espinosa's argument is unpreserved—his argument that Craig should have terminated the encounter when he learned that Moran-Espinosa was out of gas and was not in any peril. See *State v. Gonzales*, 36 Kan. App. 2d 446, 141 P.3d 501 (2006). The State asserts that at the suppression hearing, Moran-Espinosa claimed only that the initial stop was not a valid public safety stop because Craig never offered any assistance to get the car moving again.

Our review of the record shows that Moran-Espinosa briefly made both arguments in the district court. In his motion, he correctly argued that the law states both that an officer:

- May conduct a public welfare check to render assistance when appropriate under the circumstances; and
- Must terminate the encounter when it is clear that assistance is no longer needed, absent reasonable suspicion of a crime.

See *Ellis*, 311 Kan. at 929-30 (citing *State v. Pollman*, 286 Kan. 881, 888-89, 190 P.3d 234 [2008]); *Gonzales*, 36 Kan. App. 2d at 457-58. And neither argument precludes the other. So we will review these arguments as necessary.

*Standard of Review and Basic Legal Principles*

"On a motion to suppress, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo." *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). When, as here, the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The State has the burden to prove a search or seizure was legal. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

Similarly, "[w]hether reasonable suspicion exists is a question of law, and appellate courts review this question with a mixed standard of review, determining whether substantial competent evidence supports the district court's factual findings, while the legal conclusion is reviewed de novo." *City of Wichita v. Molitor*, 301 Kan. 251, 264-65, 341 P.3d 1275 (2015). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021). In our review of the factual findings, we will not reweigh the evidence or assess the credibility of witnesses. *Hanke*, 307 Kan. at 827.

### 1. *Sufficient Evidence of a Valid Welfare Stop*

Moran-Espinosa first argues that the State failed to prove a valid public safety stop. The law generally recognizes four types of encounters between individuals and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety or public welfare stops, and (4) arrests. *State v. Guein*, 309 Kan. 1245, 1253, 444 P.3d 340 (2019). Our Supreme Court has held that a public safety stop is a seizure under

7

the Fourth Amendment to the United States Constitution. *State v. McDonald*, 318 Kan. 486, 488, 544 P.3d 156 (2024). But a public safety stop is not an investigative *Terry* stop and thus does not have to be based on a reasonable suspicion of criminal activity. See *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

> "[A] warrantless traffic stop can be justified for public safety reasons '*if the safety reasons are based upon specific and articulable facts*.' *Vistuba*, 251 Kan. at 824; see *State v. Ellis*, 311 Kan. 925, 929-30, 469 P.3d 65 (2020).
>
> ". . . A valid public-safety stop therefore requires an officer to believe such a stop is necessary to protect the individual or the public based on the specific and articulable facts of the particular situation. *Ellis*, 311 Kan. at 929-30." *McDonald*, 318 Kan. at 489.

This type of stop "must be '"divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."'" *State v. Messner*, 55 Kan. App. 2d 630, 631, 419 P.3d 642 (2018). And "as with any other police encounter, the scope of the detention during a public safety stop cannot exceed the justifications for the stop." *Gonzales*, 36 Kan. App. 2d at 455. In applying the public safety rationale to justify a police-citizen encounter, courts carefully scrutinize the facts "so the protections of the Fourth Amendment are not emasculated." 36 Kan. App. 2d at 455.

In *Ellis*, our Supreme Court approved a three-part test, which incorporates these principles, for determining the legality of a public safety stop:

> "First, as long as there are objective, specific, and articulable facts from which an experienced law enforcement officer would suspect that a citizen needs help or is in peril, the officer has the right to stop and investigate. Second, if the citizen needs aid, the officer may take appropriate action to render assistance. Third, once the officer is assured that the citizen is not in peril or is no longer in need of assistance, any actions beyond that constitute a seizure, implicating the protections provided by the Fourth Amendment." 311 Kan. at 929-30.

The facts articulated by Craig relevant to his initial stop meet the first prong of this test. He testified that the highway on which Moran-Espinosa's car ran out of gas did not have a shoulder and had two lanes of traffic. The car was parked partially in the lane of travel, with the driver's door open. And two people were standing outside the vehicle. Given these circumstances, Craig believed that the car posed a potential risk of causing an accident. He pulled over and turned on his emergency lights to warn other drivers of the disabled car. He then approached and learned that the car had run out of gas. Craig's testimony shows that he had the right to stop and investigate.

Moran-Espinosa suggests that Craig's testimony was false or inaccurate. But his testimony was uncontradicted. Moran-Espinosa asks us to reweigh uncontradicted evidence or make an independent credibility ruling, which we cannot do. See *Cash*, 313 Kan. at 131 (emphasizing that when reviewing suppression decisions, our appellate courts "have no business reevaluating the testimony of witnesses on appeal").

The district court properly considered the evidence in making its decision. The district court stated its regret that there was no body camera footage to review. Still, the court considered Craig's testimony and the pictures of the car's position on the road in finding that Craig had provided specific and articulable facts, as required. And after comparing the facts here to those in *Ellis*, the district court found the initial stop was a valid public safety stop.

We agree. Craig provided objective, specific, and articulable facts showing a reasonable officer would suspect that Moran-Espinosa and his passengers needed help or that the placement of the car caused other drivers a safety risk, warranting the initial stop. Cf. *State v. Vistuba*, 251 Kan. 821, 824-25, 840 P.2d 511 (1992) (finding valid public welfare stop when officer observed person driving erratically and slowly and suspected the driver was either ill or falling asleep), *disapproved on other grounds in State v. Field*, 252 Kan. 657, 847 P.2d 1280 (1993); *State v. McKenna*, 57 Kan. App. 2d 731, 731-32,

9

740, 459 P.3d 1274 (2020) (finding valid public welfare stop when police viewed driver slumped over and unresponsive in her car); *Nickelson v. Kansas Dept. of Revenue*, 33 Kan. App. 2d 359, 360, 365, 102 P.3d 490 (2004) (valid public safety stop when, pursuant to standard highway patrol procedures, officer observed defendant pull off the highway onto a secluded farm plug and turn off his lights); *State v. Tilson*, No. 108,253, 2013 WL 2920147, at *1, 3 (Kan. App. 2013) (unpublished opinion) (valid public welfare stop when police observed defendant walking in the street at 3:30 a.m. near his overturned car with scratches and blood on his hands and defendant's friend had reported he was likely a danger to himself).

Moran-Espinosa also argues that Craig never offered to assist him nor explained the purpose for his stop. But no law requires him to do so. And as the district court noted, because the car was out of gas it was not going anywhere; the defendant could not have driven away had he wanted to, regardless of the officer's acts. Nothing Craig did actually detained Moran-Espinosa from leaving. And since Craig carried no gas, his options to assist the defendant were limited—he could call a tow truck and stay with the car to warn the motoring public or he could take the defendant in his patrol car to a gas station, leaving the car a hazard to others driving on the road. Craig chose the former. In any event, a reasonable officer would immediately know, upon learning that the car was out of gas, that no quick fix was possible, and he would have had to spend a good deal of time with three strangers before any assistance arrived. Doing so would pose a safety concern for the officer.

Our cases have recognized that when analyzing a public safety stop, we consider the officer's concern for his or her own safety as a factor. For example, in *State v. Herron*, No. 121,959, 2021 WL 1836459, at *1-2 (Kan. App. 2021) (unpublished opinion), an officer who came across a driver stranded on the side of the road due to a flat tire offered the driver a ride. The driver accepted the offer, and the officer ran a quick check of the driver's identity to ensure his safety. On appeal, this court considered the officer's offer of

10

assistance alongside his decision to run the driver's information in deciding whether a valid public welfare stop occurred. The panel found that, under those circumstances, the act of running the information fell within the context of the officer's valid public safety check. 2021 WL 1836459, at *11-12. Similarly, in *McKenna*, 57 Kan. App. 2d at 738-40, a panel of this court found that requesting and running information for outstanding warrants during a public safety check was legal when the officer believed the encounter would lead to him driving McKenna home; the check was reasonable to ensure McKenna was not dangerous.

The district court recognized that Craig offered no assistance in getting gas. Still, the district court concluded that under the circumstances, Criag did not act improperly. We agree. The events leading to Craig's discovery of Moran-Espinosa's potentially fake license happened in rapid succession. For the short time that Craig conducted his welfare check, he acted appropriately and within the scope of the encounter. Cf. *State v. Roth*, No. 122,667, 2021 WL 1826874, at *3 (Kan. App. 2021) (unpublished opinion) (noting the short time between officer's initial contact with a driver found asleep in his parked car to the moment when the officer observed evidence of possible impairment and finding the officer took appropriate action to render assistance under second prong of valid welfare stop test).

As the State contends, an officer serves the public interest by asking for a license during a public safety stop and by running a status check on the license:

> "There are several reasons for permitting a police officer performing a motorist assist to ask for a driver's license. In many cases, police officers are required to make a written report of contacts with citizens. An officer needs to know whom he or she is assisting in the event a citizen later complains about improper behavior on the part of the officer or makes any kind of legal claim against the officer. Moreover, even seemingly innocent activity, such as refueling a disabled car, could later turn out to be theft of a car that was left on the shoulder of the highway." *State v. Ellenbecker*, 159 Wis. 2d 91, 97-

11

98, 464 N.W.2d 427 (App. 1990) (holding that officer who learned that motorist needed no assistance may still demand to see driver's license and conduct status check at scene).

Finally, Moran-Espinosa argues that Craig exceeded the scope of a valid public welfare check by requesting his identification. Relying on *Ellis*, he argues that it was clear to Craig that his help was not needed before he asked for identification. We disagree. In *Ellis*, our Supreme Court found the officer's act of keeping Ellis' license after confirming her identity and ruling out the need for further assistance violated Ellis' Fourth Amendment rights. Yet our Supreme Court found the officer acted legally by asking for and verifying her identification:

> "Kent initiated his contact with Ellis in response to a store employee's concerns for Ellis' health or safety. Ellis had spent an unusually long time in the restroom and had been observed on her hands and knees on the floor. When he arrived, Kent inquired whether she was all right, consistent with an investigation into her wellbeing. Ellis replied that she was feeling generally well but was dealing with some digestive issues. This interaction was lawful.
>
> "Kent did not stop with the welfare inquiry; he proceeded to ask Ellis for identification. This was also lawful. This court has held that a law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008). Kent viewed Ellis' license and determined that she was who she purported to be and was not a minor or using false identification. At this time, the welfare check had been completed. The officer's actions up to this point were lawful." *Ellis*, 311 Kan. at 930.

The officer in *Ellis* unlawfully detained the customer by keeping her driver's license, escorting her out of the restroom and out of the store, and directing her to place calls for a ride. 311 Kan. at 931. "This was clearly more than a welfare check; she reasonably would have felt she was being subject to a criminal investigation and she was not free to leave." 311 Kan. at 931. Still, *Ellis* reaffirmed that "a law enforcement officer's mere request for identification or identifying information generally will not constitute a seizure. See *State*

12

*v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008)." 311 Kan. at 930. And nothing about the circumstances shows that Craig's request for identification violated Moran-Espinosa's Fourth Amendment rights. Rather, substantial competent evidence supports the district court's finding that Craig's initial stop was a valid public safety stop.

### 2. *Sufficient Evidence of Reasonable Suspicion for Investigatory Detention*

The remaining issue is whether Craig acted legally by using Moran-Espinosa's license to run a warrant check. Moran-Espinosa asserts that by doing this, Craig impermissibly expanded the public welfare check into an investigatory detention without reasonable suspicion of a crime. Defendant contends Craig had a duty to leave once he decided not to assist him in getting gas. But Craig did assist him by calling a tow truck. And defendant ignores that part of Craig's reason for stopping was to protect other motorists from running into the defendant's car, which remained disabled on the highway.

Kansas law is clear that police may lawfully extend a welfare check by running a warrant check on an individual when some other circumstances support prolonging the check and converting it into a detention. *Ellis*, 311 Kan. at 932. "In order for an officer to go beyond a . . . public safety check and detain a person for further investigation, the officer must have '"reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. [Citations omitted.]"'" 311 Kan. at 931.

> "Reasonable suspicion is a lower standard than probable cause, and '[w]hat is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer.' *State v. Martinez*, 296 Kan. 482, 487, 293 P.3d 718 (2013). In determining whether reasonable suspicion exists, the court must judge the officer's conduct in light of common sense and ordinary human experience under the totality of the circumstances. This determination is made with deference to a trained officer's 'ability to distinguish between innocent and suspicious circumstances,' while recognizing that it

represents a 'minimum level of objective justification' and is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' *Pianalto*, 301 Kan. at 1011 (quoting *Martinez*, 296 Kan. at 487)." *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017).

Here, nothing prolonged the safety check. The encounter swiftly changed from a welfare check into an investigation the moment that Craig asked for and received Moran-Espinosa's driver's license, looked at it, and immediately believed it to be fake. The district court properly determined that Craig had a reasonable suspicion at the time that Moran-Espinosa had committed or was committing a crime—before Craig decided to investigate his license. We agree. Craig testified that he had never seen a Mexico driver's license with a United States address since he had been doing his job, and he had seen a lot of Mexican fake identification cards. At that point, the facts presented to Craig, which he testified to with particularity, gave rise to an objective basis for suspecting criminal activity when viewed under the totality of the circumstances standard. That criminal activity was the crime of possessing a fictitious driver's license. See K.S.A. 8-260(a)(1), (e) (making it unlawful for any person to have in their possession any fictitious driver's license, including any driver's license issued under the laws of Kansas or another state or jurisdiction). Only after those events did Craig seize Moran-Espinosa's license and return to his patrol car to run it for warrants.

True, Craig also testified that his purpose in running Moran-Espinosa's information was to search for "wants and warrants" and that before running the defendant's information he was not investigating a crime. He also testified that it is his practice to ask for identification and run it for wants and warrants every time he makes a stop, even when he does not suspect criminal activity, as that is what he was trained to do. Moran-Espinosa contends this testimony shows the officer engaged in the type of flagrant misconduct that our courts consistently reject as illegal, as *Ellis* emphasizes:

"Despite repeated admonitions to the State that police may not use public welfare checks as a basis for conducting background investigations and warrant checks for citizens who may exhibit need for medical attention or police help, such conduct persists. Our caselaw stands firmly against police detaining citizens and seizing their driver's licenses when there is no indication that the citizens have engaged in criminal conduct." 311 Kan. at 942.

We need not determine whether Moran-Espinosa was detained. We have no testimony by him that he felt he was not free to leave, or that he would have walked away if Craig had not taken his license, or that he chose to stay with his car until it was towed. The controlling fact here is that Craig did not seize defendant's driver's license without an indication that defendant had engaged in criminal conduct—Craig had the right to ask for Moran-Espinosa's identification and he believed the license was fake when he first saw it. He then seized it to investigate that possibility. So although Craig may lack a lawful justification for running others' licenses at other times, his testimony shows that he lawfully pursued this investigation based on a reasonable suspicion of Moran-Espinosa's criminal activity.

This is because we determine reasonable suspicion by using an objective analysis, not an officer's subjective belief. See *Whren v. United States*, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) (outside context of inventory searches or administrative inspection, an officer's subjective motive does not invalidate objectively justifiable behavior under Fourth Amendment). So Craig's subjective motive does not invalidate his objectively justifiable behavior. See *State v. McCarter*, No. 126,449, 2024 WL 4647684, at *6 (Kan. App. 2024) (unpublished opinion) (finding district court used an improper legal standard when it judged the reasonableness of a stop by the officer's clear intention and motivation, rather than by the circumstances of the stop); see also *Cash*, 313 Kan. at 131-32 ("Given these circumstances, [the officer's] failure to provide examples for subjectively believing the baggie or the safe were suspicious and her failure to expressly testify that she subjectively considered all of the facts collectively to be

suspicious did not prevent the district court from considering the baggie and the safe in its reasonable suspicion calculus."); *State v. Robinson*, No. 123,916, 2022 WL 1122790, at *3 (Kan. App. 2022) (unpublished opinion) (applying *Cash* and finding objective facts showing stop was legal even though the officer failed to point to a specific crime to establish reasonable suspicion at the suppression hearing).

The district court properly analyzed the facts that Craig testified to with particularity in finding that reasonable suspicion existed.

> "So the relevant question for the district court at a suppression hearing is whether the *facts presented* to the officer—facts to which the officer must testify with particularity— give rise to an objective basis for suspecting criminal activity when viewed under the totality of the circumstances standard. See *Terry*, 392 U.S. at 21-22 (noting that the objective standard of reasonable suspicion requires the court to ask whether the facts available to the officer at the moment of seizure or search would warrant a person of reasonable caution to believe the search or seizure was appropriate); *Jones*, 300 Kan. at 645 (an officer is not required to neatly package the reasonable suspicion factors in a single succinct answer; the court is required to consider 'the totality of the circumstances, all facts and inferences, [and] not a select few')." *Cash*, 313 Kan. at 130.

The objective facts and circumstances justified Craig's investigation. Craig observed Moran-Espinosa's license and noticed that it listed a United States address, despite purportedly being issued in Mexico. Based on this observation and his experience as a law enforcement officer, Craig believed that the license was fake. The circumstances show objectively reasonable suspicion of a crime. We thus hold that the district court did not err by denying Moran-Espinosa's motion to suppress.

16

*Does Sufficient Evidence Support Moran-Espinosa's Conviction of Identity Fraud under K.S.A. 2021 Supp. 21-5918(b)(3)?*

Moran-Espinosa next contends that insufficient evidence supports his conviction of identity fraud under K.S.A. 2021 Supp. 21-5918(b)(3). He claims that the documents that the State relied on to prove that he committed this offense—a fake social security card—was not a certified copy of a vital record, as the statute requires. The State concedes that insufficient evidence supports the conviction and thus agrees that the conviction should be reversed. We agree as well.

When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

K.S.A. 2021 Supp. 21-5918(b)(3) states that "[v]ital records identity fraud related to birth, death, marriage and divorce certificates is . . . obtaining, possessing, using, selling or furnishing or attempting to obtain, possess or furnish to another a certified copy of a vital record, with the intent to deceive." The complaint alleged that Moran-Espinosa "unlawfully and knowingly possess[ed] or use[d] a certified copy of a vital record, to wit; a social security card with the name of Freddy David Moran-Espinosa and the social security number of L.T.B., a minor child, with the intent to deceive, in violation of K.S.A. 21-5918(b)(3)[, (e)]."

The statute's plain language requires evidence of possession of a certified copy of a vital record. The State notes that K.S.A. 2021 Supp. 21-5918(e) defines the term "identification document" as including documents that purport to be certified copies of several types of documents, including social security cards. But "identification

17

documents" are addressed in a different section of the statute than "vital records." See K.S.A. 2021 Supp. 21-5918(a)-(b). A plain reading of the statute thus shows that the subsection prohibits different acts and requires specific proof that a person possessed or otherwise illegally handled a certified copy of a vital record. No such evidence was presented here.

We thus agree with the parties that Moran-Espinosa's conviction of identity fraud under Count 2 of the State's complaint must be reversed. We reverse that conviction and affirm the remaining convictions.

Affirmed in part and reversed in part.