NOT DESIGNATED FOR PUBLICATION

No. 114,234

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

DARCY BENJAMIN FUNK UNRAU,
*Appellee*.


MEMORANDUM OPINION

Appeal from McPherson District Court; JOHN B. KLENDA, judge. Opinion filed April 15, 2016.
Affirmed.

*Jamie L. Karasek*, deputy county attorney, and *Derek Schmidt*, attorney general, for appellant.

*J. Matthew Leavitt*, of Hulnick, Stang & Gering, P.A., of Wichita, for appellee.


Before GREEN, P.J., BUSER, J., and HEBERT, S.J.


*Per Curiam*: The State appeals the trial court's decision to grant Darcy Benjamin Funk Unrau's motion to suppress preliminary breath test (PBT) results. On appeal, the State argues that the trial court erred by granting Unrau's motion for two reasons. First, the State argues that the trial court misapplied our recently decided Supreme Court case, *City of Wichita v. Molitor*, 301 Kan. 251, 341 P.3d 1275 (2015), enroute to its holding. Second, the State argues that the trial court incorrectly ruled that the police officer lacked reasonable suspicion to request a PBT. Nevertheless, both of the State's arguments fail. As a result, we affirm the trial court's suppression of Unrau's PBT results.

1

On Saturday, August 23, 2014, at 3:15 a.m., Officer Steve Koch was parked off the side of the road when a truck sped past him. Using his radar, Officer Koch determined that the truck was going 85 mph in a 55 mph zone. Officer Koch turned on his patrol car's emergency lights and followed the truck. Officer Koch would later testify that the truck did not pull over immediately, which he interpreted to mean that the driver was "run[ning] from [him]." He would also testify that instead of stopping, the driver made a wide turn onto a dirt road and then suddenly parked his truck.

After the truck stopped, Officer Koch walked up to the truck and asked the driver, later identified as Unrau, and his passenger, later identified as Ryan Kaiser, if there was any legal reason why they were speeding. Unrau responded, "No, not really." When Officer Koch asked Unrau why he did not pull over immediately, Unrau told Officer Koch that he was looking for a side road because he thought it would be safer. Then, Officer Koch asked Unrau for his driver's license and proof of insurance. As Unrau reached for his wallet in his back pocket, Officer Koch saw that Unrau had a holstered gun underneath the steering wheel. Officer Koch removed the gun and asked Unrau to get out of the truck. Unrau followed Officer Koch's instruction while telling Officer Koch that he had another gun in his truck. After removing the gun in the truck and calling for backup, Officer Koch let Unrau get back into his truck. Unrau had no difficulties getting in and out of his truck. Unrau's speech was not slurred.

Next, Officer Koch asked Unrau if he had consumed any alcohol recently. Unrau told Koch that "[he] had one or two maybe." Officer Koch noticed that Unrau's eyes were watery, glazed, and bloodshot. Officer Koch smelled an odor of alcohol coming from the truck but could not determine if the odor was coming from Unrau or Kaiser. When Kaiser opened the glovebox to retrieve Unrau's proof of insurance, a closed can of beer rolled out of the glovebox. Officer Koch asked Unrau if he was going to find any more alcohol in the car, and Unrau said, "There shouldn't be any." Because Unrau's proof of insurance was not in the first glovebox, Kaiser opened a second glovebox. Two more cans of beer

2

rolled out of the second glovebox. One beer can had been opened. After Officer Koch shined his flashlight into the truck cabin, Officer Koch also found a quarter-full 1.75 liter bottle of peach margarita behind the driver's seat. When asked about the peach margarita, Unrau told Officer Koch it had "been back there for a while."

Officer Koch asked Unrau to get out of his truck. After Unrau left his truck and had been separated from Kaiser, Officer Koch continued to smell the odor of alcohol coming from Unrau. Officer Koch asked Unrau if he would perform some standardized field sobriety tests (SFSTs). Unrau agreed to perform the walk-and-turn test and the one-leg-stand test. Under very windy conditions, Unrau passed both tests, showing zero indicators of impairment on the walk-and-turn test and the one-leg-stand test. After Unrau passed the tests, Officer Koch asked Unrau if he would submit to a PBT. Unrau agreed. Unrau failed the PBT, registering a breath alcohol content of .155. As a result, Officer Koch placed Unrau under arrest.

The State charged Unrau with one count of driving under the influence while having an alcohol concentration higher than .08, or in the alternative, one count of driving under the influence of alcohol to a degree that renders a person incapable of safely driving. The State additionally charged Unrau with possession of a firearm while under the influence of alcohol, transporting an open container, and speeding.

Unrau moved to suppress his PBT results, arguing that Officer Koch lacked reasonable suspicion to request a PBT. Specifically, Unrau argued that "[Officer Koch's] subjective observations of bloodshot eyes, and odor; combined with objective observations of speeding, admission and the presence of an open container that had 'been there a while,' [did] not reach reasonable suspicion when taken in context of the totality of the circumstances." Unrau argued that his lack of slurred speech, lack of balance problems, and lack of behavioral problems, along with the fact that he passed both SFSTs, supported that Officer Koch lacked reasonable suspicion to request a PBT.

At the suppression hearing, Officer Koch testified about the events leading up to Unrau's arrest. Through Officer Koch's examination, the State admitted into evidence Officer Koch's bodycam video and dashcam video of his encounter with Unrau. Both videos were played up to the point where Officer Koch asked Unrau to submit to a PBT.

After presenting this evidence, the State argued that the trial court should deny Unrau's motion to suppress because Officer Koch had reasonable suspicion to ask Unrau to submit to a PBT for the following reasons: (1) Unrau was speeding in the very early hours of Saturday morning; (2) Unrau was driving erratically; (3) Unrau had bloodshot, watery, and glazed eyes; (4) Unrau was emitting an odor of alcohol; and (5) Unrau had open and closed containers within the cabin of his truck. On the other hand, citing our Supreme Court's decision in *Molitor*, 301 Kan. 251, Unrau argued that the trial court should grant his motion to suppress because Officer Koch lacked reasonable suspicion to request a PBT based on the totality of the circumstances.

In agreeing that he must draw guidance from the *Molitor* decision in determining if Officer Koch lacked reasonable suspicion to ask Unrau to submit to a PBT, the trial judge stated:

> "We know through case law that reasonable suspicion is based upon the totality of the circumstances test . . . . The whole picture is to be taken into account when determining if there's reasonable suspicion.
> "Looking back on the evidence that the court saw, from the State's position they're arguing there is reasonable suspicion based upon unsafe driving. They're arguing that the defendant was doing 85 in a 55 at 3:15 in the morning, that he turned too fast, talked about that he accelerated and used possibly poor judgment. When the officer made contact with him he tried to find out why he'd pulled off at that location. As I understand it, he was trying to find a safe place to stop. The officer testified that he observed a strong odor of alcohol beverage or odor coming initially from the vehicle, later determined that to be coming from the defendant. He did note bloodshot, watery, glazed eyes. The defendant admitted drinking, said he had one or two cans of beer . . . . The officer did

4

find open containers in the vehicle, one being a beer can and the other one being the peach margarita. He said it was one-fourth full. . . .

"Looking at the exculpatory evidence or at least from the defendant's point of view which was substantiated by the videos, the defendant had really no balance issues. He had no difficulty getting in and out of the pickup and it appeared to the court this pickup was a raised vehicle. He had no slurred speech, no mood changes. He was polite and cooperative and, as noted, he passed the field sobriety tests. There were no clues indicated. The court, when it saw the defendant make the turn, it did not look as bad as what I heard from the officer. He did turn and pull off to the side and came to a stop. The court noted he had no problems getting in and out of the vehicle. Going back and looking at *Molitor* . . . . They talk about evidence of unsafe driving can suggest intoxication, but that alleged lapse of coordination must be viewed in conjunction with what followed. After stopping the vehicle, Molitor spoke without slurring any words, produced his identifying documents without difficulty, exited and proceeded from his vehicle without losing his balance, passed two admissible field sobriety tests. In other words, in the totality of the circumstances, one could not reasonably suspect that Molitor's balance was impaired by alcohol to the point of being legally under the influence. It goes on to say here the subjective observations which might suggest to the officer that Molitor was illegally intoxicated were offset by the objective indications that he was not. Then it goes on to state the panel should not have deviated from the criteria and scoring of the field sobriety tests to glean reasonable suspicion of D.U.I. from a successful completion of the admissible field sobriety tests.

"The court doesn't necessarily agree with *Molitor*, but I believe the court has to follow that.

"So, based upon the evidence and based upon the totality of the circumstances, the court is going to find that the officer did not have reasonable suspicion to request a preliminary breath test."

After the trial court granted Unrau's motion to suppress the PBT results, the State asked the trial court to clarify its ruling. Specifically, the State asked the trial court if it believed that the precedent set down by *Molitor* "overrule[d] the precedent set down by *Edgar* and *Pollman*." The trial judge responded,

5

"All I'm saying is that looking at the totality of the circumstances, looking at the evidence presented by the state . . . I'm looking very carefully at the fact that the defendant had no slurred speech, there was no problems with balance, he'd passed the field sobriety test which seems to be the gold standard, although I'm also aware that that by itself is not a reason for an officer not to be able to request a preliminary breath test. But, just watching the defendant on the video, it did not appear he was under the influence."

The State timely filed an interlocutory appeal.

*Did the Trial Court Err by Suppressing Unrau's Preliminary Breath Test Results?*

When reviewing the trial court's ruling on a motion to suppress, an appellate court uses a bifurcated standard. "The trial court's findings are first reviewed to determine whether they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo." *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013).

Under K.S.A. 2015 Supp. 8-1012(b),

"[a] law enforcement officer may request a person who is operating or attempting to operate a vehicle within this state to submit to a preliminary screening test of the person's breath or saliva, or both, if the officer has reasonable suspicion to believe the person has been operating or attempting to operate a vehicle while under the influence of alcohol or drugs or both alcohol and drugs."

"Whether reasonable suspicion exists is a question of law, and appellate courts review this question with a mixed standard of review, determining whether substantial competent evidence supports the district court's factual findings, while the legal conclusion is reviewed de novo." *Molitor*, 301 Kan. at 264-65. The existence of reasonable suspicion is

determined by examining the totality of the circumstances. See *Molitor*, 301 Kan. 251, Syl. ¶ 3; *State v. Edgar*, 296 Kan. 513, 525, 294 P.3d 251 (2013); *State v. Pollman*, 286 Kan. 881, 890, 190 P.3d 234 (2008). The State bears the burden of proof on a motion to suppress. *Martinez*, 296 Kan. at 485.

On appeal, the State argues that the trial court erred by granting Unrau's motion to suppress by attacking the trial court's application of *Molitor*. The State argues that the trial court incorrectly "construed *Molitor* to create a rule that if a suspect exhibits no slurred speak [*sic*] or problems with balance and passes field sobriety test[s] then an officer lacks reasonable suspicion to request a preliminary breath test even if that officer has made observations indicating the suspect is under the influence." The State also argues that the trial court incorrectly construed *Molitor* as overruling our Supreme Court's holdings in *Edgar* and *Pollman*. Finally, the State argues that under the totality of the circumstances, Officer Koch had reasonable suspicion to request a PBT. The State contends that the trial court failed to recognize that Officer Koch had a "minimum level of objective justification" necessary to request that Unrau submit to a PBT because: (1) Officer Koch witnessed Unrau driving unsafely; (2) Officer Koch smelled a strong odor of alcohol coming from Unrau; (3) Officer Koch observed that Unrau's eyes were watery, glazed, and bloodshot; (4) Officer Koch discovered both open and closed containers inside the truck cabin despite Unrau's assurance that there was only one closed beer can inside the truck; and (5) Unrau admitted to drinking earlier in the evening. Based on those arguments, the State requests that this court reverse the trial court's order suppressing Unrau's PBT results.

First, the State's contention hinges on a supposed distorted reading of *Molitor* by the trial court. For example: The trial court incorrectly construed *Molitor* to hold that officers lack reasonable suspicion to request a PBT if drivers do not have slurred speech, do not have balance problems, and have passed SFSTs. The State, however, takes a

myopic view of the trial court's reading of *Molitor*. All things considered, the facts in this case are very similar to the facts in *Molitor*.

In *Molitor*, our Supreme Court held that in determining whether an officer had reasonable suspicion to request a driver to submit to a PBT, the court must consider the totality of the circumstances, including inculpatory and exculpatory evidence. See 301 Kan. 251, Syl. ¶ 3. Under a totality of the circumstances test, no one fact automatically results in an officer lacking reasonable suspicion to request a PBT. Consequently, if the trial court granted Unrau's motion because it believed that *Molitor* automatically requires suppression of PBT results when the driver's speech and ability to balance are not impaired and that driver passed SFSTs, the trial court would have undoubtedly erred.

Yet, the trial court did not construe *Molitor* in this manner. In granting Unrau's motion to suppress, the State fails to take into account that the trial judge stated that he was considering whether Officer Koch had reasonable suspicion to request a PBT under the totality of the circumstances. Then, the trial court considered both the inculpatory and exculpatory evidence presented. Next, the trial court explained the *Molitor* decision. Last, the trial court determined that it must grant Unrau's motion to suppress because the evidence as a whole did not indicate that Unrau was driving under the influence. None of the trial judge's statements support the position that he believed the *Molitor* decision required him to suppress the PBT results. In fact, when the State asked for clarification on the trial judge's ruling, the trial judge told the State that he was aware that no single fact automatically meant that Officer Koch lacked reasonable suspicion to request a PBT. Consequently, the State's assertion that the trial court incorrectly misconstrued *Molitor* is out of step with the record.

Second, the trial judge never stated that the *Molitor* decision overruled the standards set out in the *Edgar* and *Pollman* decisions, as the State suggests in its brief. Moreover, the *Molitor* court did not overrule the holdings of *Edgar* and *Pollman*. See

8

*Molitor*, 301 Kan. at 265, 268 (where our Supreme Court relies on *Edgar* and *Pollman* to support its decision). When the State asked the trial judge to clarify its ruling, the State asked the trial judge if he was implying that *Molitor* overruled *Edgar* and *Pollman*. The trial judge rebuffed this question by emphasizing that he was grounding his ruling—that Officer Koch lacked reasonable suspicion to request a PBT—based on the totality of the circumstances. Therefore, the State has mischaracterized the trial judge's statements.

Third, the State has failed to establish that the trial court erred by ruling that Officer Koch lacked reasonable suspicion to request a PBT. In making its decision, the trial court relied heavily on our Supreme Court's decision in *Molitor*. Because the trial court relied on *Molitor*, it is necessary to review *Molitor* before addressing the trial court's ruling.

In *Molitor*, a police officer requested that Molitor submit to a PBT based on the following factors: (1) that Molitor failed to use a turn signal in the late evening; (2) that Molitor struck the curb while parking his car; (3) that Molitor told the officer that he had consumed two or three beers; (4) that the officer noticed that Molitor's eyes were watery and bloodshot; and (5) that the officer noticed that Molitor smelled of alcohol. Molitor moved to suppress his PBT results because he believed the officer did not have reasonable suspicion to request a PBT given (1) that he passed the walk-and-turn test and (2) that he passed the one-leg-stand test. Other exculpatory evidence suggesting Molitor was not illegally driving while intoxicated included the following: (3) that he spoke without slurring his speech, (4) that he got his identifying documents without difficulty, and (5) that he had good balance. The trial court denied Molitor's motion. On appeal, the Court of Appeals affirmed, but our Supreme Court granted a petition for review and reversed. *Molitor*, 301 Kan. at 252.

Leading to its holding in *Molitor*, our Supreme Court emphasized that a reviewing court must not assess each piece of evidence in isolation. Instead, a reviewing court must

9

look at both the inculpatory and exculpatory evidence together in determining whether reasonable suspicion exists under the totality of the circumstances. Indeed, the *Molitor* court declared: "The determination that reasonable suspicion existed obtains only after the interaction of all factors is assessed." *Molitor*, 301 Kan. at 266.

Moreover, regarding the relative strength of factors indicating that a driver is illegally intoxicated, the *Molitor* court explained that "an officer's sensory perceptions, such as the strength of the alcohol odor or the condition of the driver's eyes, are subject to an imprecise personal opinion." 301 Kan. at 267. The *Molitor* court continued: "[T]hat subjective assessment [of the officer] might be influenced by the subsequent discovery that the driver failed the PBT." 301 Kan. at 267. On the other hand, the *Molitor* court pointed out that the SFSTs were developed to "provide an objective assessment as to the probability that the driver's alcohol concentration was at an unlawful level." *Molitor*, 301 Kan. at 267.

Based on the preceding analysis, the *Molitor* court determined that although Molitor hit the curb as he pulled over, "under the totality of circumstances, one could not reasonably suspect that Molitor's balance was impaired by alcohol to the point of being legally under the influence of alcohol" because "Molitor spoke without slurring his words, produced his identifying documents without difficulty, exited and proceeded from his vehicle without losing his balance, and, most importantly, passed the two admissible SFSTs." 301 Kan. at 268. The *Molitor* court further held that any subjective observations by the officer suggesting that "Molitor was illegally intoxicated were offset by the objective indications that he was not." 301 Kan. at 268.

Returning to the facts of this case, we note that Unrau told Officer Koch that he had consumed maybe one or two drinks. Unrau's admission could be considered exculpatory evidence because, as the *Molitor* majority aptly observed: whether one or two drinks would raise Unrau's alcohol concentration in his breath or blood past the legal

10

limit is questionable. See *Molitor*, 301 Kan. at 267. Moreover, substantial competent evidence supports the trial court's finding that Unrau was not driving erratically.

For example, the trial judge watched Officer Koch's bodycam and dashcam videos, in which he observed Unrau's driving and heard Unrau tell Officer Koch that he did not stop immediately because he thought it would be safer to park on a side road. After watching those videos, the trial judge stated: "When [I] saw [Unrau] make the turn, it did not look as bad as what I heard from the officer. [Unrau] did turn and pull off to the side and came to a stop." The trial judge stated that as he understood it, Unrau "was trying to find a safe place to stop." An appellate court cannot determine the credibility of witnesses or weigh conflicting evidence. *State v. Brooks*, 297 Kan. 945, 951, 305 P.3d 634 (2013). Because we cannot second guess the credibility finding of the trial court and we cannot reweigh evidence or resolve conflicting evidence, this court must accept the trial judge's findings that Unrau was not driving erratically and that Unrau did not stop immediately because he was concerned about safety. See *Brooks*, 297 Kan. at 951.

Relying on Officer Koch's statements, the dissent emphasizes that this case is distinguishable from *Molitor* based on Unrau's erratic driving. Whether Unrau was driving his vehicle to such a degree as would indicate that he was an impaired driver, however, presents a pure question of fact. An answer to such question depends upon an evaluation of testimony presented at the trial, which itself often revolves around the credibility of the witnesses. Thus, in reaching its conclusion that *Molitor* is distinguishable the dissent necessarily reweighs the trial court's factual findings regarding Unrau's driving.

Nevertheless, the dissent attempts to question the majority's argument that the dissent is reweighing evidence and reassessing the trial judge's credibility determinations by arguing that the majority has misinterpreted the trial judge's factual findings in two ways. First, the dissent asserts that the majority has incorrectly determined that the trial

judge made a finding that Unrau was not driving erratically because the trial judge's statement that Unrau's driving "did not look as bad as [it] heard from the officer" was limited to Unrau's turn. Although the trial judge made this comment in respect to Unrau's turn, the dissent's interpretation of this evidence takes a myopic view of the trial judge's factual findings. The trial judge's statement clearly spoke to whether he believed Unrau was driving erratically and therefore DUI. Moreover, the fact the trial judge explicitly noted that the State presented evidence that Unrau turned too fast, accelerated, and "used possibly poor judgment," yet ultimately found that the videos showed that Unrau did not appear to be under the influence further supports this conclusion.

Next, the dissent asserts that the majority has incorrectly determined that Officer Koch's testimony was not credible. The dissent concludes that it is apparent that the trial judge must have found Officer Koch's testimony "credible . . . with regard to all of the evidence presented" because he "was the only source of all the evidence" and nothing in the record suggests that the trial judge discounted Officer Koch's credibility. Slip op. at 19. Nevertheless, in making this argument, the dissent is unwilling to acknowledge several pertinent facts.

First, the trial judge watched Officer Koch's bodycam and dashcam videos in addition to hearing Officer Koch's testimony. Thus, Officer Koch was not the only source of all the evidence presented at the hearing. Second, and more importantly, based upon the bodycam and dashcam videos, the trial judge was able to gauge the accuracy of Officer Koch's testimony and to observe Officer Koch's demeanor to determine if he was exaggerating. The trial judge explicitly told the State that it had reached its ruling because after "watching [Unrau] on the video, it did not appear he was under the influence." Moreover, it is clear that the trial judge disagreed with Officer Koch's testimony regarding Unrau's driving and regarding Officer Koch's belief that Unrau was trying to "run from [him]" based on the videos. Accordingly, despite the dissent's contention to the contrary, it is readily apparent that the trial judge discounted some of Officer Koch's

12

testimony. Third, it is important to point out that we do not hold as the dissent asserts that the trial judge made a finding that none of Officer Koch's testimony was credible. Instead, we hold that the trial court specifically discredited Officer Koch's testimony regarding the erratic driving based on the preceding factual findings.

To summarize, the dissent ignores the fact that the trial judge watched Officer Koch's bodycam and dashcam videos and found that Unrau's "turn . . . did not look as bad as what [he] heard from the officer." The dissent further ignores the fact that the trial judge further found that Unrau continued to drive after Officer Koch turned on his emergency lights because he "was trying to find a safe place to stop." Given the trial judge's findings, it is clear that the trial judge believed that Officer Koch was exaggerating the extent or the degree of Unrau's unsafe driving. In other words, the trial court made a credibility finding. Obviously, the dissent cannot second-guess the credibility finding of the trial judge. Because this is what the dissent is asking us to do, the dissent's argument is unconvincing.

As a result, the evidence supporting the existence of reasonable suspicion to request a PBT is Unrau's traffic violation in early morning hours, Unrau's bloodshot, watery, and glazed eyes, Unrau's odor of alcohol, Unrau's statement that there should be only one closed can of beer in the truck, and the presence of multiple open and closed containers in the truck. By contrast, the evidence supporting the lack of reasonable suspicion to request a PBT is Unrau's statement that he had only had one or two drinks, Unrau's lack of slurred speech, Unrau's lack of balance problems, Unrau's polite and normal demeanor, and Unrau's passing scores on both the walk-and-turn and the one-leg-stand tests under very windy conditions.

Thus, the only differences between the inculpatory evidence in this case and in *Molitor* is that in this case, Unrau told Officer Koch that he believed there was only one closed container of beer when there were actually multiple closed and open containers in

13

his truck. Although the trial court did not watch this part of Officer Koch's bodycam video, it is worth noting that Kaiser, Unrau's passenger, ultimately admitted that the open beer can in the second glovebox was his beer, not Unrau's beer. Kaiser also received a ticket for having an open container and drinking in the car. Regardless, more exculpatory evidence exists in Unrau's case than in *Molitor*. First, unlike in *Molitor*, the trial judge pointed out that Unrau had a polite and normal demeanor. Second, Unrau showed zero indicators of impairment on the walk-and-turn and the one-leg-stand tests while Molitor showed one indicator of impairment on both tests. Third, Unrau stated that he had consumed maybe one or two drinks, while Molitor stated that he had consumed two or three drinks. Clearly, the factual similarities between *Molitor* and Unrau's case, along with the fact that more exculpatory evidence exists in Unrau's case, supports the trial court's decision to suppress the PBT results.

Furthermore, as the trial judge noted in his findings, in *Molitor*, our Supreme Court emphasized the importance of the objective results of SFSTs compared to the subjective observations of an officer that might indicate a driver is illegally intoxicated. Although Officer Koch is an experienced police officer, no matter how much training an officer has, that "officer's sensory perceptions . . . are subject to an imprecise personal opinion." *Molitor*, 301 Kan. at 267. Meanwhile, SFSTs are scientific and above such subjective imprecision. See *Molitor*, 301 Kan. at 267. Thus, the fact Officer Koch believed Unrau's watery, bloodshot, and glazed eyes and odor of alcohol indicated he had been drinking is offset by Unrau's passing standardized field sobriety scores. Additionally, while evidence of the traffic infraction and open and closed containers in Unrau's truck certainly can suggest intoxication, considering that Unrau did not have slurred speech, did not have balance issues, did not have mood issues, and passed his SFSTs, the trial court properly ruled that Officer Koch could not reasonably suspect that Unrau was illegally intoxicated.

14

The dissent counters that in comparing Unrau's case to *Molitor*, the majority has not properly considered the presence of open and closed containers in Unrau's car despite his statement to the contrary. The dissent notes that the presence of open containers inside a car cabin is not only a crime under K.S.A. 2015 Supp. 8-1599 but also indicative of recent consumption of alcohol. In making this argument, however, the dissent ignores that courts must consider whether reasonable suspicion exists based on the totality of the circumstances. The presence of open containers is one factor in determining if an officer has reasonable suspicion to request a breath test.

Indeed, this court cannot ignore exculpatory evidence simply because one factor tends to support that a driver was DUI. Instead, this court must consider all the evidence before it, both inculpatory and exculpatory, to determine if an officer had reasonable suspicion under the totality of the circumstances. *Molitor*, 301 Kan. 251, Syl. ¶ 3. Here, the dissent has disregarded this rule, focusing solely on the fact Unrau had open and closed containers in his car despite his statement to the contrary. Nevertheless, as previously detailed, a review of all the evidence under the totality of the circumstances reveals: (1) that there were even more factors in this case supporting that the police lacked reasonable suspicion to request a PBT than in *Molitor*; and (2) the factors indicating Unrau was not DUI outweighed the factors indicating Unrau was DUI for reasonable suspicion purposes. Thus, because the dissent wants to substitute its judgment on the facts for that of the trial judge, the dissent's argument is unpersuasive.

As a final note, it seems that the State recognizes that it cannot succeed on appeal given the *Molitor* decision. In its brief, the State asserts that "[t]he *Molitor* majority was wrong." The State asks this court to follow the *Molitor* dissent and "the precedent and standards outlined in *Edgar* and *Pollman*." Nevertheless, unless there is some indication that our Supreme Court is departing from its previous position, this court is duty bound to follow our Supreme Court precedent. *State v. Belone,* 51 Kan. App. 2d 179, 211, 343 P.3d 128, *rev. denied* 302 Kan. ___ (2015). Furthermore, despite the fact the *Molitor*

15

court was split, as of now, there is no indication that our Supreme Court is departing from its positions in *Molitor*. Consequently, the State's argument fails.

Affirmed.

\* \* \*

\* \* \*

BUSER, J., dissenting: Upon my de novo review, I would find the district court erred in its legal conclusion that Deputy Koch did not have reasonable suspicion to believe that Unrau was driving his vehicle while under the influence of alcohol (DUI).

INTRODUCTION

As set out verbatim in the majority opinion, the district court anchored its legal conclusion that Deputy Koch did not have reasonable suspicion to request the PBT based on our Supreme Court's opinion in *City of Wichita v. Molitor,* 301 Kan. 251, 341 P.3d 1275 (2015). In particular, the district court compared the factors indicating and negating intoxication found in *Molitor* with the factors present in the case on appeal. Finding those factors to be equivalent, the district court reached the legal conclusion that, like *Molitor*, the PBT evidence should be suppressed in this case. Similarly, my colleagues conclude: "All things considered, the facts in this case are very similar to the facts in *Molitor*." Slip op. at 8.

I strongly disagree that the facts in *Molitor* are very similar to the facts of the present case. Although some incriminating and exculpatory facts in the two cases share similarities, two important factors in this case—indicative of an intoxicated driver—were not present in *Molitor*. As a result, I would find the district court misapplied *Molitor*'s precedent which resulted in the erroneous legal conclusion that Deputy Koch did not

16

have reasonable suspicion that Unrau was DUI. I will address the two factors individually.

UNSAFE DRIVING

In *Molitor*, the driver was stopped for making a turn without using a turn signal, although the majority emphasized that "the officer noted that Molitor had made a complete stop at the sign, had turned appropriately into the correct traffic lane, and had driven straight down the street." 301 Kan. at 252. Moreover, there was no suggestion that Molitor did not promptly stop his vehicle in response to the officer's signal to stop. In making the stop it was also noted that Molitor "ran into or onto the curb." 301 Kan. at 268. In short, there was evidence that Molitor drove as any ordinary, unimpaired driver would operate a vehicle with no evidence of unsafe driving.

In the present case, the district court characterized "the State's position" as "reasonable suspicion based upon unsafe driving" which the court described as "the defendant was doing 85 in a 55 at 3:15 in the morning, that he turned too fast, talked about that he accelerated and used possibly poor judgment." But the evidence presented at the suppression hearing was more serious and more extensive than as briefly summarized by the district court.

According to Deputy Koch, radar indicated that Unrau was excessively speeding 30 miles an hour over the posted 55 mph speed limit in nighttime conditions. Before Unrau's vehicle sped past Deputy Koch's vehicle located alongside the road, Unrau braked and as he passed the deputy he began slowing down. But upon Deputy Koch activating his emergency lights, flashing his headlights, and pursuing Unrau, the deputy observed Unrau's vehicle "actually began to speed up as it got near Pawnee Road and continued southbound from there. When I say speed up, that's—it slowed down to approximately 55 miles an hour and it began to speed up from that again."

17

Based on this unusual driving behavior, Deputy Koch surmised the driver was "probably someone that was going to run from me." As a result, the deputy activated his siren and called in his location in anticipation of a pursuit. Unrau traveled a short distance, turned onto Pathfinder Lane, and accelerated again which caused his vehicle's rear end to slide "slightly out from underneath him." According to Deputy Koch, "I thought he was trying to take off on me again. At that point I called out on the radio I was involved in a chase. Just shortly after calling that out, [Unrau] stopped and pulled over on the right side of the road there." According to the deputy, "[i]t was unexpected. I thought he was running and he just suddenly just stopped right there." Deputy Koch testified that Unrau's driving was "unusual." In his experience, "[n]ormally when you make a traffic stop, someone—they either just go or they just stop. Rarely do they slow down and speed up like he had been doing."

Deputy Koch is a law enforcement officer with 8 years' experience as a deputy sheriff for McPherson County. He testified to completing DUI training at the Kansas Law Enforcement Training Center in 2005 and having refresher courses in 2007 and 2012. This training included certification in standardized field sobriety testing.

Deputy Koch testified that, based on his training, factors indicating an impaired driver include "speed sometimes can be a concern, whether too fast or too slow; inappropriate braking; [and] reaction to emergency equipment." The deputy's concern about Unrau's strange driving was corroborated by the fact that just before he exited his patrol vehicle to approach Unrau's stopped vehicle, Deputy Koch is heard saying to himself, "What is your deal, dude?" Then, as the deputy cautiously approached Unrau's vehicle he can be seen with his hand on his holstered service weapon.

My colleagues state that the trial court made a finding "that Unrau was not driving erratically." Slip op. at 11. On the contrary, I cannot find anywhere in the record where the district court made such a finding. While the district court commented that Unrau's

18

turn onto Pathfinder Lane at the end of the pursuit "did not look as bad as I heard from the officer," there is no hint the district court rejected (or even questioned) the numerous uncontroverted facts testified to by Deputy Koch that proved Unrau's unsafe driving leading up to the turn. These undisputed facts included speeding 85 miles per hour in a 55 miles per hour zone in the nighttime, suddenly braking at high speed, decreasing his vehicle's speed from 85 miles per hour to 55 miles per hour then accelerating upon Deputy Koch's activation of emergency lights and flashing headlights, and only yielding to Deputy Koch's pursuit upon the activation of the police vehicle's siren. These uncontroverted facts of unsafe driving—regardless of whether the turn onto Pathfinder Lane at the end of the pursuit caused the rear end of Unrau's vehicle to slide "slightly out from underneath [Unrau]" as testified to by Deputy Koch—were important evidence of unsafe driving that, from the record, the district court accepted as being truthful testimony.

The majority also states the district court made a finding that Deputy Koch's testimony was not credible. I disagree. Once again, I find nothing in the record to suggest the district court discounted Deputy Koch's credibility. On the contrary, the district court analyzed all the evidence "from the State's position" and compared and contrasted it by "looking at the exculpatory evidence or at least from the defendant's point of view." Of course, Unrau did not testify. As a result, Deputy Koch was *the only source of all the evidence*—both incriminating and exculpatory—presented at the suppression hearing regarding whether the deputy had a reasonable belief that Unrau was DUI. In short, it is apparent the district court considered Deputy Koch to be a credible witness with regard to all of the evidence presented. Taking all of the evidence as true, the district court then considered the evidence from the differing perspectives of the State and Unrau in reaching its legal conclusion.

Although the majority in *Molitor* did not make a finding of unsafe driving in that case, it did observe: "Obviously, evidence of unsafe driving can suggest intoxication."

19

301 Kan. at 268. There is no equivalence, however, between Molitor's driving behavior—which was ordinary and uneventful—and Unrau's patently unsafe driving. This unusual driving behavior, which Deputy Koch believed was an attempt to elude him, was not only unsafe but also indicative of an impaired driver.

OPEN AND CLOSED CONTAINERS OF ALCOHOL IN THE VEHICLE

In *Molitor*, there was no evidence of any open or closed containers of alcohol in the vehicle at the time of the stop. There was also no evidence that Molitor, when specifically asked, lied to the officer about having alcohol in the vehicle.

In the present case, however, the district court determined, "[t]he officer did find open containers in the vehicle, one being a beer can and the other one being the peach margarita. He said it was one-fourth full." Evidence at the suppression hearing was more incriminating of DUI than as mentioned by the district court.

When Unrau's passenger opened the top glove box to search for proof of insurance for the vehicle, Deputy Koch observed an unopened Coors Light beer can. When the deputy asked Unrau if there was any other alcohol in the vehicle, Unrau "said that should be the only one, while pointing to that can." When the second glove box was opened, however, two more beer cans were found, one "completely full and unopened and the other was opened and partial." Additionally, directly behind Unrau's seat was a 1.75 liter bottle of peach margarita about a one quarter full.

It is an understatement to observe that the presence of open and closed containers of alcohol in the passenger compartment of a vehicle within reach of the driver is not only a violation of Kansas law, but it is indicative of recent consumption of alcohol in the vehicle. Given Deputy Koch's plain view observation of the open containers within reach of Unrau, the deputy issued him a citation for transportation of an open container of

alcohol, in violation of K.S.A. 2015 Supp. 8-1599. Moreover, Unrau's false statement to Deputy Koch about more alcohol not being in the vehicle certainly suggests his knowledge of wrongdoing involving consumption of alcohol while in a motor vehicle. It also suggests that other statements made by Unrau in response to the deputy's questions may have been less than truthful.

CONCLUSION

Well-settled Kansas law provides: "Reasonable suspicion is a less demanding standard than probable cause and requires considerably less than a preponderance of the evidence." *State v. Edgar*, 296 Kan. 513, 521, 294 P.3d 251 (2013) (citing *State v. Pollman*, 286 Kan. 881, Syl. ¶ 6, 190 P.3d 234 [2008]). Our Supreme Court has defined reasonable suspicion as

> ""'a particularized and objective basis for suspecting the person stopped is involved in criminal activity. Something more than an unparticularized suspicion or hunch must be articulated. Reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information possessed by the detaining authority and the information's degree of reliability. Quantity and quality are considered in the totality of circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion."' [Citations omitted.]" 296 Kan. at 521.

Our Supreme Court has also instructed that courts should review reasonable suspicion determinations by considering the totality of the circumstances *from the point of view of a reasonable law enforcement officer*. In other words, courts determine "whether reasonable suspicion exists 'with deference to a trained law enforcement officer's ability to distinguish innocent and suspicious circumstances [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance

21

of the evidence.'"' *State v. Morlock*, 289 Kan. 980, 995, 218 P.3d 801 (2009) (quoting *State v. Moore*, 283 Kan. 344, 354, 154 P.3d 1 [2007]).

As discussed above, the facts indicating that Unrau was DUI were more serious and more prevalent than those exhibited in *Molitor*. Based on the district court's statements suppressing the incriminating results, it appears the district court may have placed an over-emphasis on Unrau's successful performance on the two field sobriety tests. But *Molitor* does not stand for the proposition that the successful completion of field sobriety tests necessarily dissipates an officer's reasonable suspicion of intoxication. See *Edgar*, 296 Kan. at 524 (citing cases holding reasonable suspicion was not dispelled by the driver's perfect or adequate performance on field sobriety tests). As the facts in this case prove, an intoxicated driver with a PBT result almost twice the legal limit may have normal coordination and balance but still exhibit diminished mental acuity leading to poor decision making and unsafe driving.

After a careful evaluation of the totality of circumstances shown by the uncontroverted evidence considered by the district court, I would hold as a matter of law that the district court erred in its legal conclusion that Deputy Koch did not have reasonable suspicion to believe that Unrau was driving while DUI. Accordingly, I would reverse the district court's suppression of the PBT results and remand for further proceedings.