NOT DESIGNATED FOR PUBLICATION

No. 118,474

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KENNETH MANLEY,
*Appellant*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellee*.

MEMORANDUM OPINION

Appeal from Marshall District Court; JOHN L. WEINGART, judge. Opinion filed September 7, 2018. Reversed and remanded with directions.

*Jeremiah L. Platt*, of Clark & Platt, Chtd., of Manhattan, for appellant.

*Charles P. Bradley*, Legal Services Bureau, Kansas Department of Revenue, for appellee.

Before MCANANY, P.J., PIERRON, J., and WALKER, S.J.

PER CURIAM: Kenneth Manley appeals the district court's decision affirming his driver's license suspension for a blood test refusal. He argues that the district court erred because (1) the officers lacked probable cause to arrest and reasonable grounds to believe he was driving under the influence of alcohol or drugs and (2) the arresting officer violated his due process rights when he improperly advised Manley that he could not later rescind his test refusal. We find Manley's first claim persuasive and therefore reverse and remand for reinstatement of his driving privileges.

1

At around 11 p.m. on June 21, 2016, Marysville Police Officer James Leis saw a truck driving with a burnt-out driver's side headlamp. Leis turned his patrol vehicle around and followed the truck for a short time but did not observe any erratic driving or other traffic violations. After Leis initiated his emergency lights, the truck pulled over without incident. Leis approached the driver's side of the truck, informed the driver, identified as Manley, of the reason for the stop, and requested his information. Manley informed Leis that he did not have the documentation but gave Leis his name and date of birth.

Officer Leis observed that Manley's eyes were a little glazed and droopy. Leis did not smell an alcohol odor, but he asked Manley if he had had anything to drink that night. Manley informed Leis that he had not and that he did not drink alcohol. Leis stated that he had no trouble communicating with Manley, and Manley did not slur his words. But Leis testified he observed Manley quickly finish drinking a bottle of water while he spoke with him in his truck. Leis requested back-up and asked Manley to exit the truck to conduct field sobriety tests. Leis testified that Manley stumbled on exiting the truck. But the traffic stop video showed that Manley walked to the rear of his truck without stumbling and that Marysville Police Officer Tim Anderson arrived at that time.

Officer Leis testified that he had received training on the National Highway Traffic Safety Administration's (NHTSA) "Detection of Impaired Drivers" course which focused on detecting blood-alcohol impairment in drivers. Leis admitted that his NHTSA training did not include detecting drug-impaired driving but stated he had experience in identifying drug impairment in people. Officer Anderson testified that the field sobriety tests may reveal whether a person is under the influence of alcohol and other forms of impairment. Anderson testified that he received training in the Advanced Roadside Drug Recognition Course, which he called ARIDE, and stated that it trained law enforcement

officers to detect drug abuse and drug impairment while driving. Anderson stated that he could also use the ARIDE matrix, which required the officer to put in observed impairment clues, to see if the person fell within a particular category. Anderson testified that he watched Manley's field sobriety tests.

Officer Leis instructed and showed Manley how to perform the walk-and-turn test. Manley asked for the test to be moved to a more level surface, and Leis complied. Leis stated that Manley had trouble following instructions, maintaining his balance before the test, and that Manley showed four out of eight clues on the test. Despite this, Leis explained to his supervising officer that Manley "did pretty good on" the walk-and-turn test. But Officer Anderson testified that Manley performed the walk-and-turn test quickly and that he curved to the right during the test. Anderson admitted that a person's quick or hyperactive performance on the test did not mean the person failed. However, Anderson stated that Manley's performance on the test could have suggested drug impairment.

Officer Leis testified that Manley also performed the one-leg-stand test and showed four clues of impairment. Leis specifically stated that Manley raised his foot higher than six inches off of the ground. Officer Anderson stated that Manley raised his foot to knee level, used his arms for balance, put his foot down early, and stopped counting a few times. Anderson described Manley's behavior on the one-leg-stand test as odd.

Officer Anderson then had Manley perform the Romberg test, which required a person to tilt his or her head back, count to 30, and lift his or her head up after 30 seconds. Anderson stated he examines the person's ability to count and maintain balance. Anderson concluded that Manley performed the test correctly, but he also testified that performing the Romberg test well did not always mean that a person was not under the influence.

Officer Anderson testified that, based on his observations during the stop, he suggested Officer Leis conduct more testing on Manley. Anderson stated that he input Manley's clues and that Manley fit within the categories in the ARIDE matrix. Anderson did not specify what category Manley fell under or what clues he used in the ARIDE matrix. Additionally, Anderson testified he reviewed the totality of the circumstances with his ARIDE training and that he suggested more testing on Manley because of Manley's behavior during the field sobriety tests and because Manley was talkative and fidgety.

During the stop, Officer Leis asked Manley if he used any drugs that day, and Manley stated that he took some over-the-counter pain medication but denied using any illegal drugs. After questioning, Manley admitted that in the past he had gone to a rehabilitation facility for methamphetamine addiction. Additionally, Manley stated that he would submit to any test for alcohol including a blood test. Manley passed a preliminary breath test with the result of .00.

Manley repeatedly asked for water and stated that he was tired during the traffic stop. Officer Anderson testified that excessive thirst may reveal methamphetamine impairment and a dry mouth may suggest marijuana impairment, but he could not recall if Manley was excessively thirsty during the stop. Anderson admitted that Manley's requests for water could also simply convey that he was thirsty. Officer Leis stated that Manley may have requested water and admitted that Manley told him during the traffic stop that he was tired from working that day. Manley also testified that he was dehydrated and thirsty from work that day. Manley stated that he had driven three hours after getting off of work in Nebraska and he believed—but was not sure—that he told the officers he had Type II diabetes and he was on his way to get food when he was stopped.

After the preliminary breath test, Officer Leis placed Manley under arrest for driving under the influence and transported him to the Marshall County Jail. At the jail,

4

Manley requested and Leis gave Manley a glass of water which Leis testified that Manley drank quickly. Leis provided Manley with a written copy of the Kansas Implied Consent Form and then read it to him. Leis asked Manley if he would submit to a blood test, and Manley refused. Leis asked Manley if his answer was "no," and Manley responded, "I guess so. For now. Can I change my mind later?" after which Leis told him, "No." Leis filled out an affidavit and application for a search warrant to obtain a blood test on Manley but was unsuccessful in contacting a judge to present the warrant application.

When served with the notice of the suspension of his driver's license for his blood test refusal, Manley requested an administrative hearing with the Kansas Department of Revenue (KDOR). In the notice of suspension, Officer Leis stated that he had reasonable grounds to believe Manley was driving under the influence of alcohol or drugs because of failed sobriety tests, slurred speech, difficulty in communicating, poor balance or coordination, and bizarre behavior. At the administrative level, Manley argued that Leis lacked probable cause to arrest and had no reasonable grounds to believe that he was driving under the influence of alcohol or drugs. He also contended the officer violated his due process rights when the officer improperly informed him that he could not rescind a test refusal.

A hearing officer affirmed the driver's license suspension, and Manley petitioned for judicial review. At the de novo hearing, the parties presented the testimony described above, and Manley testified that he was not under the influence of alcohol or drugs during the traffic stop. After the hearing, the district court affirmed Manley's driver's license suspension, holding Officer Leis did not violate Manley's due process rights and that the officers had reasonable grounds to request a blood test based on the following nonexclusive factors: the headlamp violation, the clues of impairment during the field sobriety tests, balance issues, the Romberg test suggesting impairment, dry mouth, and admission to past drug use.

5

Manley has timely appealed the district court's decision.

ANALYSIS

Manley first asserts that the officers lacked probable cause to arrest him for driving under the influence of alcohol or drugs and there were no reasonable grounds to request a blood test under K.S.A. 2017 Supp. 8-1001(b).

The Kansas Judicial Review Act (KJRA) defines the scope of judicial review of state agency actions. K.S.A. 2017 Supp. 77-603(a); see *Ryser v. Kansas Bd. of Healing Arts*, 295 Kan. 452, 458, 284 P.3d 337 (2012). Appeals from administrative suspensions of driver's licenses are subject to review under the KJRA, but any appeal to the district court is de novo. K.S.A. 2017 Supp. 8-259(a); see *Moser v. Kansas Dept. of Revenue*, 289 Kan. 513, 516-17, 213 P.3d 1061 (2009). On appeal, the burden of proving the invalidity of the agency action rests on the party asserting that the agency action is invalid. K.S.A. 2017 Supp. 77-621(a)(1). The KJRA requires that an agency action must be supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 2017 Supp. 77-621(c)(7).

Our standard of review in a driver's license suspension case is twofold. This court "reviews a district court's decision in a driver's license suspension case to determine whether it is supported by substantial competent evidence. Only when there is no factual dispute does an appellate court exercise de novo review. [Citations omitted.]" *Swank v. Kansas Dept. of Revenue*, 294 Kan. 871, 881, 281 P.3d 135 (2012).

> "'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.' [An appellate] court normally gives great deference to the factual findings of the district court. The appellate court does not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in evidence. [Citations omitted.]" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

6

Under this standard, this court "[does] not consider other evidence that might support a different result as long as sufficient evidence supports the district court's decision." *Poteet v. Kansas Dept. of Revenue*, 43 Kan. App. 2d 412, 414, 233 P.3d 286 (2010).

In Kansas, any person who operates or attempts to operate a vehicle "is deemed to have given consent, subject to the provisions of this article, to submit to one or more tests of the person's blood, breath, urine or other bodily substance to determine the presence of alcohol or drugs." See K.S.A. 2017 Supp. 8-1001(a). But law enforcement officers may conduct these tests only if certain statutory conditions apply. K.S.A. 2017 Supp. 8-1001(b) provides:

> "A law enforcement officer shall request a person to submit to a test or tests deemed consented to under subsection (a):  (1) If, at the time of the request, the officer has reasonable grounds to believe the person was operating or attempting to operate a vehicle while under the influence of alcohol or drugs, or both . . . and one of the following conditions exists:  (A) The person has been arrested or otherwise taken into custody for any violation of any state statute, county resolution or city ordinance."

Any person who refuses to submit to a test requested under K.S.A. 2017 Supp. 8-1001(b) will have his or her driving privileges suspended. K.S.A. 2017 Supp. 8-1014.

Thus, in the scenario involving Manley, in order to request a test under K.S.A. 2017 Supp. 8-1001(b), Officer Leis needed for two factors to be present:  (1) reasonable grounds to believe that Manley was operating or attempting to operate a vehicle while under the influence of alcohol or drugs, or both and (2) probable cause to support an arrest. "Kansas courts evaluate 'reasonable grounds' by looking to probable cause standards. [Citation omitted.]" *Swank*, 294 Kan. at 881. Additionally, "[a]n arrest must be lawful before an arresting officer is authorized to request a test under K.S.A. 2008 Supp. 8-1001(b)(1)(A) to determine the presence of alcohol or drugs." *Sloop v. Kansas Dept. of Revenue*, 296 Kan. 13, Syl. ¶ 3, 290 P.3d 555 (2012).

7

"'Probable cause is determined by evaluating the totality of the circumstances . . . [meaning] there is no rigid application of factors and courts should not merely count the facts or factors that support one side of the determination or the other.' [Citations omitted.]" *Sloop*, 296 Kan. at 20. Moreover, courts must view the totality of the circumstances "through the lens of an objectively reasonable police officer." *State v. Keenan*, 304 Kan. 986, 994, 377 P.3d 439 (2016). The probable cause required to justify a warrantless arrest is

> """a reasonable ground for belief of guilt; and this means less than evidence which would justify condemnation of conviction; probable cause exists where the facts and circumstances within the knowledge of the officer making the arrest or search, and of which he had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."' [Citations omitted.]" 304 Kan. at 994.

Preliminarily, Manley claims that the KDOR improperly considered his walk-and-turn test and the one-leg-stand test (field sobriety tests), arguing that the *City of Wichita v. Molitor*, 301 Kan. 251, 341 P.3d 1275 (2015), decision limits the use of field sobriety tests to providing evidence only that a driver's body has a specific blood-alcohol content.

In *Molitor*, the Supreme Court ultimately held that the Court of Appeals panel erred in concluding that the officer had reasonable suspicion to request a preliminary breath test (PBT) under K.S.A. 2010 Supp. 8-1012(b). The Supreme Court considered the Court of Appeals panel's decision:

> "The Court of Appeals listed 'the factors supporting reasonable suspicion' as being 'striking the curb, very strong odor of alcohol, bloodshot and watery eyes, admission to drinking beer, losing balance during instruction phase of walk-and-turn test, and putting foot down on the one-leg-stand test.' The panel summarily dismissed the exculpatory evidence, as follows:

8

> 'We note that there is evidence in the record that Molitor was
> able to speak without slurring his words, produced his identification
> without difficulty, and had only one clue each on the walk-and-turn test
> and the one-leg-stand test. But we do not find that these factors
> substantially dissipated Officer Diaz' reasonable suspicion that Molitor
> had operated a vehicle under the influence of alcohol.' [Citations
> omitted.]" 301 Kan. at 265.

The *Molitor* court held when reviewing the totality of the circumstances, one could not reasonably suspect that Molitor's balance suggested that "[he] was impaired by alcohol to the point of being legally under the influence of alcohol." 301 Kan. at 268. The holding is based on two evidentiary concerns. First, the Supreme Court found that the reasonable suspicion standard under K.S.A. 2010 Supp. 8-1012(b) had changed: the old statute required the officer to believe there was alcohol in the driver's body, while the current statute requires the officer to believe the driver was driving while operating a vehicle with an *illegal level* of alcohol in his or her body, i.e., with a .08 or more alcohol concentration. See 301 Kan. at 266. Thus, the Supreme Court found an officer's subjective observations such as the strength of an alcohol odor and the driver's watery and bloodshot eyes are less compelling under the current statute because (1) it does not necessarily show the driver was operating the vehicle with an illegal amount of alcohol in his or her body and (2) subjective observations are open to imprecise personal opinions. See 301 Kan. at 266-67.

Second, the Supreme Court regarded evidence obtained from the field sobriety tests differently:

> "[T]he [field sobriety tests] were developed by the NHTSA after both laboratory studies
> and field studies, from which clues were identified and a scoring criteria developed that
> would provide an objective assessment as to the probability that the driver's alcohol
> concentration was at an unlawful level (.10). For instance, the arresting officer in the
> [*State v.*] *Shadden*[, 290 Kan. 803, 235 P.3d 436 (2010),] case testified at trial that if a

9

driver exhibits two clues, he or she fails the [field sobriety test], creating a 68% probability that the driver's concentration of alcohol is .10 or more. *In other words, [field sobriety tests] are alleged to result in an objective assessment of the level of alcohol in a driver's body, rather than just the presence of alcohol in the body*. [Citations omitted.]" (Emphasis added.) *Molitor*, 301 Kan. at 267.

In reviewing all the circumstances, the *Molitor* court held that although the officer saw Molitor engage in unsafe driving—he ran his vehicle into the curb when he pulled over—that fact must also be considered with his later actions and behavior: "[he] spoke without slurring his words, produced his identifying documents without difficulty, exited and proceeded from his vehicle without losing his balance, and, most importantly, passed the two admissible [field sobriety tests]." 301 Kan. at 268. The *Molitor* court also found that the Court of Appeals panel, whose decision they were reviewing, had erroneously

"padded its description of the intoxication indicia by referring to the one clue on each [field sobriety test] to which the officer testified. But the officer admitted that Molitor passed the tests, and we have nothing in the record which would tell us what one clue reveals about a person's alcohol concentration level. Indeed, '[s]everal studies suggest that cut-off scores are set too low on the psychomotor [field sobriety tests],' and one study 'found that over 50% of drivers at .00% BAC failed Walk and Turn.' The panel should not have deviated from the criteria and scoring of the NHTSA's standardized testing model to glean reasonable suspicion of DUI from a successful completion of the admissible [field sobriety tests]. [Citation omitted.]" 301 Kan. at 268.

Citing to *Molitor*, Manley argues the KDOR erred in using his field sobriety tests results because (1) Officer Leis did not suspect Manley of driving under the influence of alcohol and (2) his field sobriety tests may be used only to determine the likelihood that he had a specific blood-alcohol content and not that he was driving while under the influence of drugs.

10

We disagree with Manley's argument that the field sobriety tests are totally without probative value in this case. When Officer Leis conducted the field sobriety tests, Leis and Officer Anderson were investigating if Manley was driving under the influence not just of alcohol, but also of drugs. Leis conducted the field sobriety tests after speaking with Manley in his truck but before Manley submitted to the preliminary breath test with the .00 result. Additionally, the *Molitor* decision does not limit the use of a driver's field sobriety tests in a court or administrative proceeding to providing only an objective assessment of whether a driver has a certain blood-alcohol level. The *Molitor* court held the Court of Appeals panel erred in not considering all the circumstances and in failing to recognize that the officers' subjective observations were offset by the objective indications that Molitor was not illegally operating his vehicle while under the influence of alcohol. See 301 Kan. at 265-69. In short, the field sobriety tests formed a part of the totality of the circumstances in evaluating Manley's condition.

Also, it appears Manley may be arguing that the officers were not properly trained or qualified to use field sobriety tests to determine whether he was under the influence of drugs. This is essentially an objection to foundation for the officers' opinion testimony regarding Manley's alleged impairment, but Manley did not challenge the officers' testimony under K.S.A. 2017 Supp. 60-456 below or on appeal. Instead, Manley argues only that *Molitor* prevents the officers from using his field sobriety tests to determine if he was driving while impaired by drugs. As noted above, we disagree that the field sobriety tests are totally immaterial on that issue. But Manley's failure to make a contemporaneous objection to foundation or specifically appeal this point, and his failure to provide any authority on this issue, means that we deem this argument waived and abandoned. See *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015) (citing *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 [2013]).

In passing, and although Manley did not challenge the admission of the officers' testimony under K.S.A. 2017 Supp. 60-456, we note that the decision in *State v. Shadden*,

11

290 Kan. 803, 235 P.3d 436 (2010), provides support for the idea that the officers could testify how Manley's acts and behavior suggested drug impairment based on their training and experience. Here, Officer Leis stated that he was trained to use the field sobriety tests to detect alcohol impairment under the NHTSA and that he had some experience identifying drug impairment in people. Officer Anderson testified his ARIDE training helped him detect potential drug abuse and driving while impaired by drugs.

First, K.S.A. 2017 Supp. 60-456 defines opinion testimony in Kansas as:

> "(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).
> "(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case."

The *Shadden* court applied the older standard under *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923), to review the reliability and admissibility of expert testimony on scientific evidence. Notably, Kansas courts now apply the standard under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 495-97, 369 P.3d 966 (2016) (discussing legislative transition to *Daubert*). Nevertheless, the *Shadden* decision supports the argument that the officers did not improperly testify regarding Manley's possible drug impairment.

In *Shadden*, our Supreme Court held that a police officer may not testify without establishing a *Frye* foundation that a person's failure on the walk-and-turn test means there is a 68% chance that his or her blood-alcohol content is greater than .10. 290 Kan. at 813. The *Shadden* court explained that "there is a dividing line between admitting field sobriety test results as circumstantial evidence of intoxication, which is admissible, and the use of such results to assert or imply a specific level of intoxication, which is not admissible unless an appropriate scientific opinion foundation has been laid." 290 Kan. at 823. Our Supreme Court held: "Opinion testimony based on objective observations regarding an automobile driver's coordination, balance, and mental acuity is not scientific evidence." 290 Kan. 803, Syl. ¶ 15. The *Shadden* court also held that "lay and expert witnesses are permitted to testify as to their observations of an automobile driver's acts, conduct, and appearance and also to give opinions on the driver's state of impairment based on those observations." 290 Kan. 803, Syl. ¶ 14.

The bottom line is that we find the KDOR did not err in considering Manley's field sobriety tests when deciding whether the officers lawfully requested a blood test under K.S.A. 2017 Supp. 8-1001(b). The officers conducted the tests while investigating whether Manley was impaired by alcohol or drugs. Also, *Molitor* does not limit the use of a person's field sobriety tests to only providing an objective assessment whether the person has a specific blood alcohol content. Finally, Manley did not contest whether the officers' provided improper opinion testimony and, generally, *Shadden* supports that the officers properly testified whether Manley showed signs of impairment based on their training and experience.

The more difficult issue arises as a result of considering whether first, the officers had reasonable grounds to believe Manley was driving under the influence of alcohol or drugs, and second, whether they had probable cause to arrest Manley, as necessary prerequisites to testing under K.S.A. 2017 Supp. 8-1001(b).

13

As noted above, an officer has probable cause "'where the facts and circumstances within the knowledge of the officer making the arrest or search, and of which he had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Keenan*, 304 Kan. at 994. In a probable cause determination, this court must review all the circumstances at the time of the arrest and avoid merely counting the facts or factors that support one side of the determination or the other. See *Sloop*, 296 Kan. at 20.

In examining the record, we note that the district court did not expressly conclude that the officers had probable cause to arrest Manley for driving under the influence of alcohol or drugs. But neither party objected to the district court's ruling. If no objection is made to the district court's inadequate findings of fact or conclusions of law, an appellate court may presume that the district court found all facts necessary to support its judgment. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015).

The district court did find, and the parties do not contest, that Officer Leis arrested Manley for driving under the influence of alcohol or drugs after Manley submitted to the PBT. Accordingly, any factual circumstances considered after this point should not factor into this court's probable cause for arrest analysis. See *Sloop*, 296 Kan. at 23 (declining to consider postarrest conduct in probable cause to arrest calculus).

Manley first argues that the factual circumstances in this case are similar to the *Sloop* decision, where our Supreme Court held that the officer lacked probable cause to arrest Sloop for driving under the influence. See 296 Kan. at 23. Specifically, Manley argues there is less evidence here than in *Sloop* to support that the officers had probable cause to arrest him. Manley asserts that he was not pulled over for a moving violation, he did not slur his words or have trouble communicating with Officer Leis. Also, though Leis stated Manley's eyes were glazed and droopy, Leis did not state how that related to

14

impairment. Finally, Manley told Leis he did not drink alcohol that night, and his preliminary breath test was .00.

The above circumstances are, in fact, similar to the factual circumstances in *Sloop*. In *Sloop*, our Supreme Court held that the officer lacked probable cause to arrest Sloop for driving under the influence because "[his] speech was not slurred, he did not fumble while producing his license, and he did not stumble when exiting his vehicle and was steady when walking to the rear." 296 Kan. at 23. Also, Sloop was pulled over for an unlit tag light after the officer stated that he followed Sloop's vehicle for 8 to 10 blocks without observing a traffic infraction. 296 Kan. at 23.

The *Sloop* court held that the tag light violation did not indicate impairment and distinguished the facts from the decision in *Campbell v. Kansas Dept. of Revenue*, 25 Kan. App. 2d 430, 296 P.2d 1150 (1998). *Sloop*, 296 Kan. at 22. In *Campbell*, the panel held there was probable cause to arrest Campbell because the officer observed him speeding at 1:10 a.m., the officer smelled alcohol on him, and Campbell admitted to consuming a few alcoholic drinks before the stop. 25 Kan. App. 2d at 431-32. In *Sloop*, the Supreme Court found "[t]he primary factual difference between *Campbell* and the instant case is that Campbell was speeding, *i.e.*, committing a moving violation, while Sloop was driving legally before being stopped for an improper tag light." 296 Kan. at 22. Thus, the *Sloop* court explained that a tag light violation provides less indication that a driver is driving while impaired than a moving or speeding violation. See 296 Kan. at 22. On related note, panels of this court have also refused to find that a tag light or a nonworking headlight violation are indicative of impairment when the officers did not testify at trial that it was a typical clue of intoxication. See *Chambers v. Kansas Dept. of Revenue*, No. 115,141, 2017 WL 1035442, at *7 (Kan. App. 2017) (unpublished opinion); *Sjoberg v. Kansas Dept. of Revenue*, No. 103,937, 2012 WL 3966511, at *7 (Kan. App. 2012) (unpublished opinion).

As applied to this case, Officer Leis pulled over Manley's truck for a burnt-out driver's side headlamp. Like the unlit tag light in *Sloop*, the headlamp violation provides less indication that Manley was driving while intoxicated than a speeding or moving violation. Leis also did not observe Manley driving erratically. Finally, Leis did not testify that a headlamp violation was a typical clue of impairment; accordingly we will not consider the headlamp violation in the probable cause for arrest and reasonable grounds determinations. See *Chambers*, 2017 WL 1035442, at *7.

But the factual and legal similarities with *Sloop* end there. Two differences make *Sloop* distinguishable from this case. Unlike *Sloop*, the officers here conducted the field sobriety tests before Officer Leis arrested Manley. Based on a review of all the circumstances, we find that Leis and Officer Anderson were investigating whether Manley was impaired by alcohol, drugs, or both. In contrast, the officers in *Sloop* mainly investigated Sloop for driving under the influence of alcohol. Although *Sloop* provides some support, the case is distinguishable overall.

Here, the district court found the officers had reasonable grounds—in addition to the headlamp violation—based on a nonexclusive list which included Manley's balance, the clues on the field sobriety tests and the Romberg test, his dry mouth, and his admission to prior drug use.

In reviewing the totality of the circumstances, Officer Leis testified that Manley did not engage in erratic driving, i.e., Manley was pulled over for a nonworking headlamp. Thus, we find the district court erred in considering Leis' reason for the stop indicated impairment. See *Sloop*, 296 Kan. at 22. Manley also gave Leis his name and date of birth after informing Leis that he did not have his documentation, and Leis stated that he had no trouble communicating with Manley. Leis stated Manley stumbled when he exited the car, but Manley also asked to perform the field sobriety tests on a more level surface, which is indicative of Manley's alertness to his surroundings. Leis stated

16

that Manley's eyes were glazed and droopy and were one factor that led him to suspect either alcohol or drug impairment. After the field sobriety tests, Manley passed a PBT with the result of .00.

Manley did not fail all the sobriety tests. Rather, he had mixed results: he did poorly on the one-leg-stand test but the officers testified that he did well on the walk-and-turn and performed the Romberg test correctly. Manley's performance on the one-leg-stand test supported that he had some balance issues. Officer Anderson stated that Manley's quick performance on the walk-and-turn test and one-leg-stand test may not amount to a failure but it could suggest drug impairment. As applied to the Romberg test, although Manley performed the test well, Anderson stated that certain drugs may cause a person to perform the test well and that a passing score does not always indicate that the person was not drug impaired. Anderson stated that Manley's impairment clues caused Manley to fall within the categories on the ARIDE matrix, but he did not testify which categories applied or how the matrix itself measured drug impairment.

Officer Anderson also testified he suggested Officer Leis request more testing after observing Manley's behavior during the stop. Anderson testified that Manley was talkative and fidgety, which were factors that led Anderson to suspect drug impairment. Anderson stated he did not recall that Manley was excessively thirsty; but he stated that excessive thirst could suggest methamphetamine and a dry mouth may indicate marijuana impairment. Anderson admitted that a dry mouth may also indicate only thirst. According to the ruling, the district court weighed the evidence and found Manley's dry mouth indicated drug impairment. See *Talkington*, 301 Kan. at 461 (appellate court cannot reweigh evidence under substantial evidence review).

After a careful review of the totality of the evidence, we are convinced that the officers did not have probable cause to believe Manley was driving under the influence of alcohol alone. Manley was pulled over for a nonworking headlamp, Officer Leis did not

17

observe him drive erratically, there was no alcohol odor, his speech was not slurred, he had no trouble communicating with the officers, he denied consuming alcoholic beverages, he had glazed and droopy eyes, he did not fail all the field sobriety tests, and his PBT result was .00. Thus, we find that the officers did not have probable cause to arrest or reasonable grounds to believe Manley was driving under the influence of alcohol alone.

However, it is less clear that the officers had probable cause to believe Manley was under the influence of a combination of alcohol or drugs, or just drugs alone. As the KDOR acknowledges, there are few Kansas cases where officers have investigated a driver for driving under the influence of drugs.

The decision in *Leverenz v. Kansas Dept. of Revenue*, No. 112,039, 2015 WL 5750535 (Kan. App. 2015) (unpublished opinion), does provide a useful comparison. In *Leverenz*, an officer pulled over a vehicle for failing to signal a lane change and turn, but the officer believed the driver was impaired based on confused driving, i.e., "various driving errors such as stopping when there was no stop sign and slowing down as if to make a turn and then accelerating again." 2015 WL 5750535, at *1. The officer was a certified Advanced Roadside Impaired Driving Enforcement (ARIDE) officer. During the stop, Leverenz admitted she took her antidepressant medication an hour before the stop and that she knew there was a warning about mixing it with alcohol. The officer did not have trouble communicating with Leverenz, and her speech was not slurred. After noting other signs of alcohol impairment, the officer asked and the driver performed various field sobriety tests which indicated impairment. Later, the driver passed a PBT (.063), and, after her arrest, she passed an evidentiary breath test (.059). Suspecting that drugs were contributing to her impairment, the officer requested that a Drug Recognition Expert (DRE) evaluate her but the DRE could not make it to the station that night. The officer requested and Leverenz refused to submit to a blood test, which resulted in the suspension of her license.

The panel held the officer did not need additional reasonable grounds to request multiple tests under K.S.A. 2011 Supp. 8-1001 and reasoned that the officer had reasonable grounds to believe Leverenz was impaired by something other than alcohol:

> "Deputy Ribble testified Leverenz exhibited signs of impairment—dilated eyes—that are inconsistent with alcohol impairment. Leverenz also admitted to Deputy Ribble she had taken her antidepressant 1 hour before the traffic stop and had taken a number of other prescription medications. She also failed her field sobriety tests. Deputy Ribble believed that her level of impairment was not consistent with the results of her breath test and, therefore, felt the need to have her evaluated by a DRE. There is no requirement in our law that a DRE evaluation be conducted as a prerequisite to a blood test request. Based upon the testimony before the district court, we find that Deputy Ribble had reasonable grounds to suspect drug impairment." 2015 WL 5750535, at *5.

In comparing the circumstances in *Leverenz* to this case, Manley did not engage in unsafe or erratic driving, Manley communicated with the officers without difficulty, and he did not slur his words. Additionally, Officer Leis testified that Manley had glazed and droopy eyes that made him suspect alcohol or drug impairment. Manley did not admit to taking any prescription medications which should not be mixed with alcohol. Rather, Manley admitted he took some over-the-counter pain medication that day and denied using any illegal drugs. Manley also passed the PBT.

Unlike *Leverenz*, Manley did not fail all the sobriety tests. Manley performed poorly on the one-leg-stand test but performed well on the walk-and-turn test and performed the Romberg test correctly. Because Officer Anderson testified that field sobriety tests may provide evidence that a driver is impaired by something other than alcohol, Manley's quick performance on the tests could suggest to a reasonable officer that he was drug impaired. However, this is offset by the fact that the Romberg test did not suggest drug impairment. Here, Anderson testified that Manley's passing performance on the Romberg test does not necessarily indicate that the person is *not* drug impaired.

19

But taking the officer's testimony at face value indicates that Manley's performance on the Romberg test is at very best a neutral factor which does not provide substantial—legal and relevant—evidence to support that Manley either was or was not impaired by drugs. In any event, we do not consider the Romberg test results as clearly contributing to either reasonable suspicion that Manley was under the influence of drugs or probable cause to justify an arrest.

Additionally, unlike in *Leverenz*, Officer Anderson testified how he applied his ARIDE training, resulting in his suggestion to Officer Leis that there should be more testing on Manley based upon the ARIDE matrix. Anderson also based his opinion, in part, on Manley's fidgety and talkative behavior. Anderson may also have considered Manley's quick performance on the sobriety tests. But while Anderson testified that Manley's clues of impairment caused Manley to fall onto the ARIDE matrix, he did not state what clues or what categories applied.

Finally, the district court found Manley's dry mouth was one factor supporting reasonable grounds to request a blood test. It is undisputed that Manley repeatedly requested water during the stop. The district court weighed the evidence and this particular finding is supported with substantial evidence. The district court also found Manley's admission—that he previously attended rehabilitation for methamphetamine addiction—was one factor that contributed to the finding that Manley was impaired. But we do not afford Manley's admission much weight because it does not provide legal and relevant evidence for a reasonable officer to conclude that Manley was impaired during the traffic stop.

Overall, after a thorough review of the totality of the circumstances, we do not find that the officers had probable cause to support a lawful arrest and reasonable grounds to believe Manley was driving under the influence of alcohol or drugs. An officer has probable cause "'where the facts and circumstances within the knowledge of the officer

20

making the arrest or search, and of which he had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Keenan*, 304 Kan. at 994. Moreover, the "'[e]xistence of probable cause must be determined by consideration of the information and fair inferences therefrom, known to the officer at the time of the arrest.'" *Sloop*, 296 Kan. at 20.

Contrary to the district court's finding, Manley did not exhibit unsafe or erratic driving. He communicated with the officers without difficulty. But the appearance of Manley's eyes potentially indicated either alcohol or drug impairment. Manley did not admit to taking prescription drugs or to using illegal drugs. Manley was talkative, fidgety, and performed the sobriety tests quickly. Manley did not fail every sobriety test but had balance issues and failed the one-leg-stand test.

Officer Anderson stated that thirst and dry mouth may show either marijuana or methamphetamine impairment. Anderson also testified that Manley's impairment clues placed him on the ARIDE matrix but he did not state what categories or what clues he applied to reach that finding. Also contrary to the district court's finding, Anderson's testimony does not establish whether the Romberg test indicated drug impairment. Specifically, Anderson stated that Manley's *correct* performance on the test did not necessarily indicate whether he was or was not drug impaired. Finally, Manley's admission to attending rehabilitation for methamphetamine addiction does not provide strong evidence to an objectively reasonable officer that he was impaired at the time of the traffic stop.

Thus, based on a review of all the circumstances, information, and fair inferences observed during the traffic stop, we find that the officers did not have probable cause to support a lawful arrest of Manley for driving while impaired by alcohol or drugs. For this

21

reason, the decision of the district court upholding the determination of the hearing officer must be set aside, and Manley's driving privileges reinstated.

For his second issue on appeal, Manley asserts that his due process rights were violated when Officer Leis misstated the law and told Manley that he could not change his mind and later consent to the blood test after he initially refused. In light of our finding on Manley's first issue, this issue has become moot and we decline to address it in this opinion.

Reversed and remanded with instructions to reinstate Manley's driving privileges.